Kay APPONI, et al.,
Plaintiffs-Appellants,

v.

SUNSHINE BISCUITS, INC.,
Defendant-Appellee.

No. 79–3529.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 4, 1980.

Decided June 24, 1981.

Mike Fain, Bogin & Patterson, Asher Bogin, Dayton, Ohio, for plaintiffs-appellants.

David S. Cupps, Vorys, Sater, Seymour & Pease, Columbus, Ohio, Thomas E. Bezanson, Chadbourne, Park, Whiteside & Wolff, New York City, for defendant-appellee.

Before LIVELY and KEITH, Circuit Judges and COHN,* District Judge.

KEITH, Circuit Judge.

This case presents issues of contract construction. The contract in question is a pension plan which covered employees at the Sunshine Biscuit Company's Dayton, Ohio bakery. Sunshine closed its Dayton bakery in June of 1972. At that same time, Sunshine terminated the pension plan which covered the bakery workers. A class of former Sunshine employees who had worked at the bakery and who had been covered by the pension plan filed this suit. The workers claimed that they were entitled to benefits under the plan. The district court concluded that the workers were clearly not entitled to benefits. Accordingly, the court granted Sunshine's motion for summary judgment. We think that there are questions of fact that can only be resolved at trial. Accordingly, we reverse and remand for further proceedings.

## FACTS

The factual circumstances surrounding the closing of Sunshine's Dayton bakery are not in issue. What is in issue is whether certain former employees are entitled to benefits under the pension plan. The pension plan itself is relatively short and simple. It reads as follows:

---

* The Honorable Avern Cohn, United States District Court for the Eastern District of Michigan,

*THE COMPLETE TEXT*
*OF THE*
*SUNSHINE PENSION PLAN*
*AS IN EFFECT JANUARY 1, 1970*

*Effective Date*

1. The Pension Plan is applicable to all covered employees of Sunshine Biscuits, Inc. eligible for retirement on or after January 1, 1958, in accordance with the provisions hereof.

*Coverage*

2. An employee is covered by the Pension Plan if he is employed by any of the Company's biscuit, cracker or candy manufacturing plants, cheese plant, flour mills, or branches regularly distributing the finished products of such plants, or is one of any other group of employees to whom coverage under the Plan has been extended by action of the Board of Directors or the Plan's Administrative Committee.

3. Pension benefits under this Plan are not payable to any employee who is a participant under any other Annuity, Retirement, Pension or similar plan which is wholly or partially financed by the Company.

*Normal Retirement Benefits*

4. The normal retirement date is the first day of the month next following the employee's 65th birthday, if the employee is then in the active employ of the Company.

5. An employee will be eligible to retire on his normal retirement date, provided he has completed 15 or more years of continuous service.

6. The first payment of an employee's pension benefits will be made upon retirement, and subsequent payments will be made monthly thereafter.

7. The amount of normal retirement benefit payable to an employee each month will be determined from his years of service and average monthly earnings for the 5-year period ending on December 31st prior to normal retirement date, in accordance with the applicable table set forth at the end hereof. The computation of "years of

sitting by designation.

service" and "average monthly earnings" is set forth in Paragraphs 9–17 hereof.

8. Benefits will be paid to a retired employee as long as he lives, provided he does not engage in any occupation in competition with or detrimental to the business of the Company or any of its branches, subsidiaries or affiliated companies.

*Computation of Years of Service*

9. "Years of Service" means completed years of continuous service from date of employment to actual or normal retirement date, but in no event beyond normal retirement date.

10. Loss of time due to accident incurred in the course of employment will be counted as continuous service.

11. Military leaves of absence will be counted as continuous service if the employee returns to employment in accordance with the terms specified by applicable law or in his leave.

12. Leaves of absence exceeding 9 months in duration will break continuous service, except in cases of serious personal circumstances such as illness or accident, where leaves of absence are extended with the written approval of the Company.

13. Lay-offs exceeding 9 months in duration will break continuous service.

14. If an employee leaves the service of the Company and is subsequently re-employed, the date of re-employment will be used in determining his continuous service.

*Computation of Average Monthly Earnings*

15. "Average Monthly Earnings" means the employee's average monthly base pay for the 5-year period ending on December 31st prior to his actual or normal retirement date, excluding overtime compensation, premium pay and any other extra remuneration.

16. If an employee has been paid on an hourly, weekly, semi-monthly or bi-weekly basis, his earnings will be converted to their monthly equivalent.

17. If an employee has lost earnings as a result of absence from work due to sickness or accident for a period of 30 consecutive calendar days, each such period will be disregarded in computing his average monthly earnings.

*Disability Pensions*

18. If an employee becomes permanently and totally disabled during active employment with the Company when he is age 45 or more and has 15 or more completed years of continuous service at the time he becomes disabled, he will be eligible to be retired on a disability pension.

19. An employee will be considered to be permanently and totally disabled by the Administrative Committee upon receipt of a certificate to that effect from a physician designated by the Company, or upon such other proof as the Committee may prescribe.

20. Disability pensions will be paid beginning with the 7th month from the commencement date of the disability.

21. The amount of disability pension payable to an employee each month will be $45, or an amount computed as follows, whichever is greater:

(a) Determine the amount applicable to the employee's years of service and average monthly earnings for the 5-year period prior to the date of commencement of disability in accordance with the applicable table set forth at the end hereof.

(b) Reduce the amount determined under (a) by 6% for each year or fraction thereof prior to age 62.

(c) To the result determined in accordance with (a) and (b), add 10%.

(d) Round off the amount determined in accordance with (c) to the nearest dollar.

(e) In no case shall the amount determined in accordance with (d) exceed the amount determined in accordance with (a).

22. The Company reserves the right to require proof of continuation of permanent and total disability from time to time, and may terminate disability pensions if proof is not provided.

*Early Retirement Benefits*

23. An employee will be eligible to retire early, provided he is at least 55 years of age and has completed 15 or more years of continuous service.

24. An employee may apply for early retirement for reasons other than permanent and total disability, with the understanding that he will not engage in any occupation in competition with or detrimental to the business of the Company or any of its branches, subsidiaries or affiliated companies.

25. The amount of early retirement benefit payable to an employee each month will be computed as follows:

(a) Determine the amount applicable to the employee's years of service and average monthly earnings for the 5-year period prior to the date of early retirement in accordance with the applicable table set forth at the end hereof.

(b) Reduce the amount determined in accordance with (a) by 6% for each year or fraction thereof prior to age 62.

(c) Round off the amount determined in accordance with (b) to the nearest dollar.

*In Event of Death of Retired Employee*

26. (a) At any time before payment of benefits is to begin an employee may elect to take a reduced pension of equivalent actuarial value payable to the employee for life and to a designated beneficiary for life if the beneficiary survives him. Each such election shall become effective on an effective date (provided the employee is then living) to be specified therein that must be at least two years after filing of the election.

(b) If optional election of a reduced pension shall not have been made and become effective as provided in sub-paragraph (a), retirement benefits will be paid for 36 months from date of retirement, provided at least one payment shall have been made; if death occurs before a retired employee receives 36 monthly payments, his retirement benefits will continue to be paid to his beneficiary after his death for the remainder of the 36-month period.

*Social Security*

27. Benefits under the Pension Plan are in addition to the benefits to which a retired employee may be entitled under the Social Security Law.

*Assignments*

28. No employee shall have the right to assign, transfer or otherwise to subject to lien the benefits under the Pension Plan, except as may be otherwise provided or required by law.

*Cost*

29. The cost of the Pension Plan is to be borne entirely by the Company.

*Miscellaneous*

30. Nothing in this Pension Plan in itself shall give any employee the right to be retained in the employ of the Company.

31. An Administrative Committee, appointed by the Board of Directors, shall administer the Pension Plan. The determination of the Committee as to all administrative and interpretive matters and the application of the Pension Plan shall be conclusive.

32. The Company has every intention of continuing the Plan indefinitely. However, should unforeseen events occur in the future, the Company reserves the right to modify or terminate the Plan.

The key provision of the pension plan which is in dispute here is paragraph 23. Paragraph 23 provides:

"An employee will be eligible to retire early, provided he is at least 55 years of age and has completed 15 or more years of continuous service."

The plaintiff class members are former Sunshine employees who accumulated 15 or more years service with the company before losing their jobs in 1972 when Sunshine shut down its Dayton bakery. However, all of the class members were under 55 at this time. The plaintiff class members argue that under ¶ 23, minimum pension rights

vested after 15 years of employment. The plaintiffs contend that 15 years of continuous service is all that is required. According to the plaintiffs, the clause "provided he is at least 55 years of age" only refers to the time the employee begins to collect his benefits.

Unsurprisingly, Sunshine disagrees. Sunshine contends that in order to retire early, an employee had to have 15 years continuous service and had to be working for the company at age 55. Therefore, according to Sunshine, an employee had to be at least 55 years old *and* have 15 years service before the employee acquired any pension rights. Sunshine views the age 55 requirement as a minimum vesting age. Sunshine interprets the pension plan as giving a 55-year-old employee with 15 years service the option of retiring early and taking a reduced pension, or continuing to work until age 65 and retiring on a full pension.

The district court initially found some merit in plaintiff's position, and denied Sunshine's motion to dismiss. However, upon further reflection, the court thought that the plain and ordinary meaning of the pension plan compelled it to agree with Sunshine. Accordingly, the court entered summary judgment for Sunshine. The plaintiffs have appealed.

## I.

This case presents a clash between conflicting rules of contractual construction.

The district court accepted Sunshine's argument that the plain and ordinary meaning of the words in Paragraph 23 were such that plaintiffs were not entitled to benefits. The "plain and ordinary meaning" doctrine is at the heart of contract construction. Under this doctrine, "words appearing in a written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument." *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 245–46, 374 N.E.2d 146, 150 (1978). *See also, Jolliff v. Hardin Cable Television Co.*, 26 Ohio St.2d 103, 106–07, 269 N.E.2d 588, 590 (1971); *Olmstead v. Lumbermens Mutual Insurance Co.*, 22 Ohio St.2d 212, 216, 259 N.E.2d 123, 126 (1970).[1]

Sunshine's argument is simple. The dictionary definition of "employee" is "one who works for wages or salary in the service of any employer." [2] The dictionary definition of "retire" is "[t]o withdraw from office, a public station, business, or the like ..." [3] Applying these dictionary definitions, Sunshine argues that in order to retire from a company, one must then be employed by it. Sunshine laid off the members of the plaintiff class in 1972, before any of these workers reached the age of 55. Sunshine concludes that the workers' pension rights never vested since the workers were not "employees" at age 55 and thus could not "retire" at that age. Sunshine buttresses this basic argument by contend-

---

1. Federal jurisdiction in this case is based on diversity of citizenship. 28 U.S.C. § 1332. The issues raised are those of state law and there is no question that Ohio law controls this case. *See e. g. American Fidelity & Casualty Co. v. Indemnity Life Ins. Co. of North America*, 308 F.2d 697, 699 (6th Cir. 1962), *cert. denied*, 372 U.S. 942, 83 S.Ct. 935, 9 L.Ed.2d 968 (1963).

 We note that had the Bakery employees in this case been terminated after 1974, they would have been protected by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.* Under the federal pension standards outlined in ERISA, it appears that the company could not cut off benefits to these workers. *See* 29 U.S.C. §§ 1053, 1056(a). However, because the Bakery was

 shut down in 1972, over two years before ERISA was enacted, ERISA provides no protection. *See Baker v. Otis Elevator Co.*, 609 F.2d 686 (3d Cir. 1979). *See also* 29 U.S.C. § 1001, which contains ERISA's findings and declaration of policy. ("... many employees with long years of employment are losing anticipated retirement benefits owing to the lack of vesting provisions in such plans ... owing to the termination of plans before requisite funds have been accumulated, employees and their beneficiaries have been deprived of anticipated benefits ...").

2. Webster's New International Dictionary 839 (2d ed. 1961).

3. *Id.* at 2128.

ing that examination of the rest of the pension plan supports its position.[4]

The plaintiffs argue that the "plain and ordinary meaning" doctrine is inapplicable here because the pension plan is ambiguous. Plaintiffs argue that the "employee" does not have to be an employee at the time of his 55th birthday to be eligible for early retirement—it should be enough that he was an "employee" for 15 years.

Plaintiffs point out that the pension plan has two other provisions providing for benefits. One provision relates to normal retirement benefits; the other relates to disability benefits. In each of the paragraphs relating to normal retirement benefits and disability benefits, the pension plan used words of limitation to narrow the definition of "employee." Specifically, paragraph four provides:

> The normal retirement date is the first day of the month next following the employee's 65th birthday, *if the employee is then in the active employ of the company* (emphasis added).

Paragraph 18 provides:

> If an employee becomes permanently and totally disabled *during active employment with the Company* when he is age 45 or more and has 15 or more completed years of continuous service at the time he becomes disabled, he will be eligible to be retired on a disability pension. (emphasis added)

Plaintiffs point out that paragraph 23, relating to early retirement benefits, contains no similar words of limitation. Plaintiffs argue that it follows that there was no intent by the parties to limit the term "employees" in paragraph 23 to employees in active employment with the company at the time they retired.

Plaintiffs point out that other provisions in the pension plan do not require an "employee" to be employed at the time he becomes eligible to collect benefits. Specifically, an "employee" who is disabled can collect a disability pension seven months after the commencement of the disability. *See* ¶¶ 20, 21 of pension plan, reprinted *supra*. Yet, such an "employee" is obviously not working if he is disabled. From this, plaintiffs argue that "the term 'employee' is used throughout the written pension plan to refer to a potential recipient of pension benefits, without regard to whether he is currently employed by Sunshine." Pl. Br., at 10.

Finally, plaintiffs seek support in Ohio precedents which require us to strictly con-

---

4. First, the company points out that paragraph 24 of the pension plan provides that an employee who takes early retirement cannot engage in employment detrimental to the company. As the district court noted, this contemplates that the employee will be employed by the company when the employee applies for early retirement.

Second, the company points out that under paragraph 25, the amount of early retirement benefits is computed by determining average monthly wages for the five-year period prior to the date of early retirement. Under the plaintiffs' construction, former employees who were not employed by the company during the five-year period prior to their 55th birthday would have no base pay period from which to compute a pension. The company argues that this anomalous situation suggests that plaintiffs' construction of the pension plan is incorrect.

Third, the company argues that throughout the plan there is a repeated and definite linkage between employment and retirement. *e. g.* "an employee may apply for early retirement." (P24) This linkage, argues the company, dem-

onstrates that the pension plan required an employee to meet both the age and length of service requirements to qualify for early retirement benefits.

The Company also cites a number of cases which it claims supports its position. *See Baker v. Otis Elevator Co.*, 609 F.2d 686 (3d Cir. 1979); *Gratian v. General Dynamics, Inc.*, 587 F.2d 121 (2d Cir. 1978); *United Steel Workers, Local 2098 v. International Systems & Controls Corp.*, 566 F.2d 1135 (10th Cir. 1977); *Schneider v. Electric Auto Lite Co.*, 456 F.2d 366 (6th Cir. 1972); *Finnell v. Cramet, Inc.*, 289 F.2d 409 (6th Cir. 1961); *International Association of Machinists v. Servel, Inc.*, 268 F.2d 692, 698–99 (7th Cir.), *cert. denied*, 361 U.S. 884, 80 S.Ct. 155, 4 L.Ed.2d 120 (1959); *Wallace v. Northern Ohio Traction & Light Co.*, 57 Ohio App. 203, 204, 13 N.E.2d 139, 149 (1937). The problem is that each of these cases interpreted a pension plan which is different from the one in this case. Although sometimes analogies exist, cases presenting issues of contract construction are *sui generis*.

strue pension plans to avoid a forfeiture,[5] and which also require us to strictly construe the plan against Sunshine, the drafter of the plan.[6]

## II.

The defendant has a strong argument that the plain and ordinary meaning of the words "employee" and "retire," preclude the award of early retirement benefits to former employees of the company. The notion of an employee retiring would seem to include, as a prerequisite, employment immediately prior to the termination of any working relationship between the company and the employee.

On the other hand, the company did not clearly limit early retirement benefits to those employees working at the company at a given time. Yet the company was careful to limit disability and "normal" retirement benefits to those employees. Therefore, there is arguably room enough for us to apply Ohio's strong policies against forfeiture of benefits in order to rule in plaintiffs' favor.

Upon consideration, however, we see no need to rule on the contract construction question. We believe that there is an issue for the trier of fact which may well dispose of this appeal.

The plaintiffs introduced numerous affidavits from former employees at the Sunshine Bakery. In these affidavits, the employees claimed that company representatives had lied during collective bargaining negotiations. The content of the affidavits is well summed up in the following paragraph from the plaintiffs' brief:

In short: (i) in negotiations prior to the 1968 contract negotiations Union representatives told Sunshine's negotiators that they understood that an employee with fifteen years' service did not have to be working at Sunshine on his fifty-fifth birthday in order to qualify for early retirement benefits and Sunshine's negotiators agreed; (ii) in the 1968 and 1970 contract negotiations, when the Union representatives requested clarifying language consistent with their understanding, Sunshine's negotiators responded that that was unnecessary because Sunshine agreed with that understanding; (iii) that understanding was communicated to the employees at contract ratification meetings; and (iv) the employees relied upon those communications of their understanding that an employee with at least fifteen years' service did not have to be working at Sunshine on his fifty-fifth birthday in order to qualify for early retirement benefits.

 We think that the allegations made in the affidavits present triable issues of fact. We rely on two related doctrines, waiver and estoppel.[7] It is well settled that a party may voluntarily relinquish a known right through words or by conduct. *State ex rel. Ford v. Board of Education*, 141 Ohio St. 124, 47 N.E.2d 223 (1943); *White Co. v. Canton Transportation Co.*, 131 Ohio St. 190, 2 N.E.2d 501, 503–05 (1936); *List & Son Co. v. Chase*, 80 Ohio St. 42, 88 N.E. 120, 122 (1909). It is similarly settled that a party whose conduct misleads another is barred, or estopped from asserting legal rights that it otherwise could assert. *Ohio Farmers Ins. Co. v. Cochran*, 104 Ohio St. 427, 135 N.E. 537 (1922); *National City Bank v. Citizens Bldg. Co. of Cleveland*, 74 N.E.2d 273 (Cuyahoga County Court of Ap-

---

5. *See Ervin v. Garner*, 25 Ohio St.2d 231, 240, 267 N.E.2d 769 (1971); *Matter of Erie Lackawanna Railway Co.*, 548 F.2d 621, 627 (6th Cir. 1977). *See also Lemmon v. Cedar Point, Inc.*, 406 F.2d 94, 97 (6th Cir. 1969); *Neuffer v. Bakery & Confectionary Workers International Union*, 307 F.2d 671, 674 (D.C.Cir.1962).

6. *See Smith v. The Eliza Jennings Home*, 176 Ohio St. 351, 199 N.E.2d 733 (1964); *Sigman v. Rudolph Wurlitzer Co.*, 57 Ohio App. 4, 11

N.E.2d 878 (1937); *Keller v. Graphic Systems of Akron, Inc.*, 422 F.Supp. 1005, 1011 (N.D. Ohio 1976).

7. Waiver and estoppel are related doctrines. *See Andrews v. Ohio St. Teachers Ret. Sys. Bd.*, 62 Ohio St.2d 202, 404 N.E.2d 747 (1980). *See also Russell v. Fourth Nat'l. Bank*, 102 Ohio St. 248, 269–70, 131 N.E. 726 (1921).

peals 1947).[8] If company representatives did make the statements they were alleged to have made during the labor negotiations, then the company shall be precluded from arguing that it is not liable. The company will simply be held to its word.[9]

### III.

■ The plaintiffs have raised other claims. None have merit. First, the plaintiffs alleged a violation of the federal securities laws. This cause of action is precluded by *Teamsters v. Daniel*, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979). Second, the plaintiffs claimed that the company's

alleged misrepresentations amounted to common-law fraud. Fraud claims are governed by Ohio's four-year statute of limitations, Ohio Rev.Code § 2305.09. We must agree with the district court that this claim is time-barred.[10] Finally, plaintiffs raise various arguments concerning the district court's certification of the class.[11] There is no need for us to reach these questions now. If necessary, class-certification questions can be resolved once the merits are decided.

### IV.

In summary, we reverse and remand for a jury trial as to whether the company

---

**8.** The elements of estoppel have been stated in various ways. In *Ensel v. Levy*, 46 Ohio St. 255, 19 N.E. 597 (1889), the court stated:

> ... it is fair to assume, that where one, by his acts or declarations, made deliberately and with knowledge, induces another to believe certain facts to exist, and that other rightfully acts on the belief so induced, and is mislead thereby, the former is estopped to afterwards set up a claim based upon facts inconsistent with the facts so relied upon, to the injury of the person so misled.

Similarly, in *Indemnity Co. v. Shavel Co.*, 112 Ohio St. 136, 152, 147 N.E. 329 (1925) and *Fleming v. City of Steubenville*, 44 Ohio App. 121, 184 N.E. 701 (1931), citing 21 Corpus Juris 1113, the court stated:

> Estoppel by misrepresentation, or equitable estoppel, is defined as the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person who in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right either of contract or of remedy. This estoppel arises when one by his acts, misrepresentations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts.

More recently, the Ohio Supreme Court has stated:

> Equitable estoppel precludes a party from asserting certain facts where the party, by his conduct, has induced another to change his position in good faith reliance upon that conduct.

*State ex rel. Cities Service Oil Co. v. Orteca*, 63 Ohio St.2d 295, 409 N.E.2d 108, 1020–21 (1980). (citing cases)

The statements made in the affidavits more than meet all of the elements of equitable estoppel. Paragraph 23 in the pension plan has enough ambiguity that we can see why the union would reasonably rely on the company's representations that an employee's rights would vest after 15 years of service. In any event, the existence of representations, if any, is for the jury to determine. A court can then determine whether the union reasonably and detrimentally relied on the representations of the company negotiators.

**9.** Our position is also supported by federal labor law policy. Pension plans and retirement benefits are compulsory subjects of collective bargaining. *Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S.Ct. 1185, 1189, 55 L.Ed.2d 443 (1978); *NLRB v. Black-Clawson Co.*, 210 F.2d 523 (6th Cir. 1954). An employer such as Sunshine has a duty to bargain in good faith over compulsory subjects of collective bargaining. We think that Ohio courts would construe Ohio law to further federal labor law policies.

**10.** There is no doubt that the plaintiffs' cause of action accrued when the alleged fraudulent act took place or was discovered. This was no later than 1972 when the company shut down its Dayton Bakery. *See Peterson v. Teodosio*, 34 Ohio St.2d 161, 297 N.E.2d 113 (1973). The complaint was not filed until November, 1977.

We emphasize that the plaintiffs never claimed that they were unaware of the alleged fraud. Plaintiffs specifically declined to make a tolling argument below.

**11.** Plaintiffs argue that the district court erred in establishing two sub-classes of plaintiffs rather than a single, unitary class. Plaintiffs also argue that the district court erred in establishing certain cut-off dates for subclass membership.

made the representations alleged in the affidavits.[12] Accordingly, the judgment of the district court is affirmed in part and reversed in part and the case is remanded for further proceedings consistent with this opinion.

12. The respective roles of judge and jury in contract cases depends on the circumstances. Ordinarily, the construction of a written contract is a matter of law, to be decided by a judge. *See Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 246, 374 N.E.2d 146, 148 (1978); *New York, Chicago & St. Louis Railroad v. Heffner Construction Co.*, 9 Ohio App.2d 174, 177, 223 N.E.2d 649, 653 (1967). However, "[w]hile it is the function of a court to construe a contract, it is the province of the jury to ascertain and determine the intent and meaning of the contracting parties in the use of uncertain or ambiguous language." *Amstutz v. Prudential Insurance Co.*, 136 Ohio St. 404, 26 N.E.2d 454 (1940). *See Filtro Import Co. v. Janszen Co.*, 36 Ohio App. 63, 172 N.E. 578 (1930); *Petroleum, Inc. v. Liberty Petroleum Co.*, 505 F.2d 1384 (6th Cir. 1974). *See generally* Annot., 65 A.L.R. 648 (1930).

In this case, we do not think that there is sufficient ambiguity in the wording of the pension plan of the sort that might create a jury question. However, issues as to waiver or estoppel are classic examples of disputed questions of fact which are amenable to decision by a jury. *See e. g. Pannunzio v. Ins. Co.*, 168 Ohio St. 95, 151 N.E.2d 545 (1958). See also Judge Engel's excellent discussion on the role of judge and jury in determining questions of estoppel and tolling of a statute of limitations. *Ott v. Midland-Ross Corp.*, 600 F.2d 24 (6th Cir. 1979) (age discrimination case).