Harry ULRICH, Jr., et al., Plaintiffs,

v.

**GOODYEAR TIRE & RUBBER CO., et al., Defendants.**

**No. 87–CV–1384A.**

United States District Court, N.D. Ohio, E.D.

April 2, 1991.

---

Richard Sternberg, Sternberg, Newman & Associates, Akron, Ohio, for plaintiffs.

Edward C. Kaminski, Buckingham, Doolittle & Burroughs, Akron, Ohio, Charles R. Armstrong, Sr., Carolyn T. Wonders, United Rubber, Cork, Linoleum & Plastic Workers of America, Akron, Ohio, for defendants.

## ORDER

SAM H. BELL, District Judge.

This cause is currently before this court on remand from the Court of Appeals for the Sixth Circuit pursuant to that court's opinion dated September 8, 1989. *Ulrich v. The Goodyear Tire and Rubber Company,* 884 F.2d 936 (1989). In that opinion, the Sixth Circuit disagreed with this court's view that plaintiffs' breach of contract claims are not preempted by federal labor law and remanded this cause with instructions that this court rule on the merits of plaintiffs' claims by using "federal common law." Both plaintiffs and defendant have submitted briefs on the issue; both parties have had the opportunity to discuss the case informally and have argued same for the record. It has been decided earlier that no further trial proceedings are necessary. The record of the original trial testimony, the briefs filed and the arguments heard and considered will determine the disposition of this cause.

## I. BACKGROUND

Plaintiffs were originally bargaining unit employees who were transferred to supervisory jobs outside of the unit while employed by Motor Wheel Corporation, a subsidiary of Goodyear. When they learned in 1986 that Goodyear was negotiating to sell Motor Wheel, plaintiffs requested that Goodyear transfer them back to the bargaining unit. They say they relied to some degree on the following provision of the collective bargaining agreement (hereinafter CBA).

> If an employee in a supervisory or other position outside of the bargaining unit returns to a job within the bargaining unit as a result of a reduction in production requirements or job elimination he shall be credited with his total seniority and the privileges that accrue thereto. If he returns for reasons other than those stated above he will be restricted to his service in the bargaining unit for bargaining unit seniority purposes....

CBA, Art. X, 1(d)(3). Plaintiffs also claim that they relied particularly on verbal assurances by Goodyear that they could return to the bargaining unit whenever they desired, such returns being consistent with past practice.

But Goodyear did not acquiesce in plaintiffs' request and subsequently sold Motor Wheel, eventually transferring all of the division's employees, including many of the plaintiffs, to the purchaser's payroll. Plaintiffs then filed a grievance with the union based upon the aforementioned provision in the CBA. The union did not process the grievance because plaintiffs were not bargaining unit employees. Plaintiffs then filed a complaint against Goodyear and the union, alleging a violation of § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a), and adding pendent state breach of contract and promissory estoppel claims against Goodyear.

At the close of the trial evidence, the defendants moved to dismiss the case pursuant to Fed.R.Civ.P. 41(b). This court granted the motion with respect to the § 301 claim and dismissed the state claim without prejudice. The latter dismissal was based upon a finding that plaintiffs' state law claims did not involve interpretation of the CBA; as such, the claim lost its federal character and was subject to discretionary dismissal. *See United Mine Work-*

*ers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Goodyear appealed the court's decision to dismiss the pendent claims without prejudice.

The Sixth Circuit did not disturb this court's dismissal of the § 301 claim, but reversed the dismissal of the state law breach of contract and promissory estoppel contentions. The appellate court reasoned that, contrary to this court's decision, plaintiffs' pendent claims are preempted by federal law because the "request for return to the bargaining unit and for seniority rights upon return depends on rights created by the CBA ... The existence of the plaintiffs' so-called 'state-law claim' is inextricably intertwined with the CBA. It depends on the practices of the workplace under the CBA." *Ulrich,* 884 F.2d at 938. The Sixth Circuit remanded this cause for further proceedings and specifically instructed this court to answer three questions regarding the merits of the state claim:

> Our conclusion that the state claims are preempted does not completely dispose of the case. Plaintiffs are entitled to a ruling on the merits of their contract and promissory estoppel claims as a matter of federal common law. The District Court must answer the following three questions: Do plaintiffs have the right to return to the bargaining unit? If so, do they have seniority? If they have seniority, what is their remedy? All of these questions are closely related and depend on an exposition of the CBA, the practices of the workplace and federal labor law. We, therefore, remand this cause for further proceedings. The District Court should decide on the merits the issue of whether any of the plaintiffs have a contractual right to return to the bargaining unit, and if so, the nature of their seniority rights and the appropriate remedy.

*Id.* at 938–39.

By order dated November 26, 1990, this court determined that the issues for resolution on remand have been properly and fully adjudicated in the original trial proceedings. Thus, to determine the merits of plaintiffs' state law claims, the trial record will be reevaluated and the facts therein applied to the "federal common law" of labor contracts.

## II. ANALYSIS

In their brief, plaintiffs argue that the record supports their right to recovery under breach of contract and promissory estoppel theories, that the record shows that they are entitled to seniority, and that the appropriate remedy is to return them to the positions requested in 1986 with whatever damages which may have accrued to their benefit.

Goodyear does not address the specific merits of plaintiffs' claims. Rather, Goodyear argues that plaintiffs state claims should now be dismissed because they are merely a rephrasing of the § 301 claim, which has already been dismissed. Alternatively, Goodyear believes that the state claims, even if different in nature from the § 301 claim, should properly be put before an arbitrator because the Sixth Circuit has ruled that they necessarily involve interpretation of the CBA, which provides for arbitration in such circumstances.

While this court cannot agree with the analysis offered by Goodyear, it is of the opinion that defendant should prevail on the merits in this cause for the reasons stated below.

The federal common law of labor contracts is a developing body of law having direct and deeply rooted ties to § 301. This statute provides, in pertinent part, as follows:

> (a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). The Supreme Court has held that by enacting § 301, Congress intended that federal courts fashion a body of federal common law for adjudicating disputes arising out of labor contracts.

The range of judicial inventiveness will be determined by the nature of the problem. See *Board of Commissioners v. United States*, 308 U.S. 343, 351 [60 S.Ct. 285, 288, 84 L.Ed. 313 (1939)]. Federal interpretation of the federal law will govern, not state law. Cf. *Jerome v. United States*, 318 U.S. 101, 104 [63 S.Ct. 483, 485, 87 L.Ed. 640 (1943)]. But state law, if compatible with the purpose of § 301, may be resorted to in order to find the rule that will best effectuate the federal policy. See *Board of Commissioners v. United States, supra* [308 U.S.] at 351–352 [60 S.Ct. at 288–89]. Any state law applied, however, will be absorbed as federal law and will not be an independent source of private rights.

*Textile Workers Union of America v. Lincoln Mills of Alabama*, 353 U.S. 448, 457, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957).

The doctrine of § 301 preemption directs that when a claim is brought involving state law principles and necessitates interpretation of the CBA, the claim is labeled one under § 301, state contract law is displaced, and the dispute is resolved by application of federal common law. The importance of uniform federal law in this area has been emphasized by the Supreme Court.

It was apparently the theory of the Washington court that, although *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448 [77 S.Ct. 912, 1 L.Ed.2d 972], requires the federal courts to fashion, from the policy of our national labor laws, a body of federal law for the enforcement of collective bargaining agreements, nonetheless, the courts of the States remain free to apply individualized local rules when called upon to enforce such agreements. This view cannot be accepted. The dimensions of § 301 require the conclusion that substantive principles of federal labor law must be paramount in the area covered by the statute. Comprehensiveness is inherent in the process by which the law is to be formulated under the mandate of *Lincoln Mills*, requiring issues raised in suits of a kind covered by § 301 to be decided according to the precepts of federal labor policy.

*Teamsters Local v. Lucas Flour Co.*, 369 U.S. 95, 103, 82 S.Ct. 571, 576, 7 L.Ed.2d 593 (1962) (citations omitted). *See also Lingle v. Norge Division of Magic Chef*, 486 U.S. 399, 403–06, 108 S.Ct. 1877, 1879–81, 100 L.Ed.2d 410 (1988).

Before addressing specific questions raised by the evidence adduced during the trial of this cause and, as well, those legal principles applicable to that evidence, the court's method of inquiry and analysis should be defined. Plaintiffs' claims for redress are said to be claims resulting from a breach of contractual obligations owed plaintiffs by Goodyear. In the alternative, plaintiffs contend the doctrine of promissory estoppel should be invoked as a basis for finding plaintiffs entitled to damages and/or other relief.

It is the court's belief that a conventional contract analysis here is not applicable. It may be argued that the CBA might be viewed as extending to plaintiffs certain contract rights in association with their employment. But plaintiffs are not members of the bargaining unit and hence are not parties to the terms of the CBA. Even were they to be considered parties in the sense used here, the CBA does not define the rights of either the company or the union in the context of the rights of the employee to return to the bargaining unit after having become a member of management. We shall return to a brief comment on Article X in this context at a later point in this decision.

Additionally, plaintiffs claim a contractual right to "return to work" (return to the bargaining unit) which right arises from Goodyear's promises that employees could do so. Such a contract, if such it can be said to be, defies specificity and exactness sufficient for the court to properly construe or enforce it. It is thought then, for the reasons briefly stated, that analysis of this cause from the standpoint of breach of contract is not proper. Rather, it is quite proper to assess the evidence in this cause under the standards of the doctrine of promissory estoppel.

Since those early debates which led to the acceptance of promissory estoppel as a vehicle by which the rights of parties under certain circumstances are adjudged,[1] there has been an expanded use of the doctrine of estoppel as a legal replacement or substitute method of analysis in applicable "contract" cases. Plaintiffs have pointed correctly to Restatement of Contracts § 90 as the most appropriate artifact to be utilized in resolving the issues before the court. The claims in this cause are ones which are predicated upon averments of promises made and not kept; the facts indicate that "reliance" rather than "consideration" is the moving justification for the application of remedies. The same facts indicate that verbal assurances were made to plaintiffs and others concerning their ability to return to work if they desired to leave their supervisory positions. Contract questions of consideration or bargain are only faintly perceived under these circumstances. Section 90(1) states:

A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice is to be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

Restatement (Second) of Contracts, § 90 (1981).

Having decided upon the method of analysis it is best to define first the elements of promissory estoppel as they exist within the framework of federal labor common law, and then determine whether the evidence elicited during the course of trial served to prove those elements. Additionally, a proper analysis should look, as an alternative, to the nature of promissory estoppel as an equitable remedy and to determine its applicability, if any, under the facts disclosed in the case. We begin with a discussion of the elements of estoppel as defined for us by the appellate court.

There is no need to borrow the views of the state courts for the purpose of defining the elements of promissory estoppel inasmuch as the Sixth Circuit has defined a federal common law of estoppel in a labor setting. In *Apponi v. Sunshine Biscuits, Inc.*, 652 F.2d 643 (6th Cir.1981) the plaintiff employees sought benefits under a pension plan after defendant employer's company closed. The district court, *inter alia*, granted the employer's motion for summary judgment on the employee's breach of contract claim. The Sixth Circuit reversed this determination, holding that triable issues of fact existed as to whether the employer had made certain representations regarding the pension plan. The court remanded the case so that a jury could decide whether the employer made the representations alleged. *Id.*, 652 F.2d 643, 649–51. The jury found that the employer's agents had made such representations.

The parties cross-appealed the jury's decision. The employer argued that the employees' claims necessarily arose out of the employer's purported obligations under the collectively-bargained pension plan and thus were preempted by § 301. Based upon this argument, the employer contended, *inter alia*, that the district court improperly failed to instruct the jury on the elements constituting estoppel. In considering and upholding this appeal, the Sixth Circuit elaborated on the federal common law of estoppel as that theory applies in a § 301 setting.

The elements constituting estoppel, as defined by federal common law, are: (1) conduct or language amounting to a representation of material facts; (2) the party to be estopped must be aware of the true facts; (3) the party to be estopped must intend that the representation be acted on or act such that the party asserting the estoppel has a right to believe it so intended; (4) the party asserting the estoppel must be unaware of the true facts; and (5) the party asserting the estoppel must detrimentally and justifiably rely on the representation.

1. The reader's attention is invited here to Grant Gilmore's dissertation on the subject in The Death of Contracts. Ohio University Press (1974).

*Apponi v. Sunshine Biscuits, Inc.*, 809 F.2d 1210, 1217 (6th Cir.1987) (citations omitted). *See also UAW v. Park–Ohio Industries, Inc.*, 661 F.Supp. 1281, 1305 (N.D.Ohio 1987) *aff'd in part, rev'd in part*, 876 F.2d 894 (6th Cir.1989). A close reading of the elements referred to indicate that they are such as would normally be viewed as elements of *equitable* estoppel. While the court agrees with plaintiffs suggestion that equitable and promissory estoppel are not precisely identical, the difference in nature is not determinative in reaching an opinion in this cause.[2] Because of the precedent of the *Apponi* decision this court will analyze the present facts in keeping with the elements set forth therein.[3]

The first prong of the *Apponi* test asks whether the employer has engaged in conduct or language amounting to a representation of material facts. That this occurred is without question. Throughout the trial, several employees testified that promises were made by Goodyear personnel that a return to the bargaining unit could be made at any time at the employee's option. Without reprinting the specific excerpts from the record, the court finds the testimony of the following witnesses to be sufficient to satisfy *Apponi*'s first prong: Roger Williams, Tr. at 49–51; 57–58; Steve Carroll, Tr. at 68; Odus Rittenberry, Tr. at 78–79; Terry Popa, Tr. at 102–103; Harry Ulrich, Tr. at 112; Charles Minson, Tr. at 143–44; Hubert Black, Tr. at 162; Don Rohn, Tr. at 180; William Barna, Tr. at 268–72; Dwight Tudor, Tr. at 285; Edwin Lytle, Tr. at 305; Robert Serdinak, Tr. at 360; Richard Springer, Tr. at 378.

The second prong of the estoppel test, that the employer "be aware of the true facts," is perhaps more difficult to satisfy than the first prong. This factor, as applied to this situation, asks whether Goodyear knew that its promises were not as broad as stated, or that the promisees would not have an unqualified right to return to hourly positions whenever they pleased. The testimony of Goodyear employees Don Fleshman and Jim Kruse establishes that the promises were indeed overbroad and that certain Goodyear personnel knew this to be the case. Fleshman stated that employees were wrong if they believed the "old wives tale" that they had an absolute right to return to the bargaining unit.

Q. Were you aware of the fact during your years in personnel that a number of people who had left the bargaining unit believed that they had an absolute right to go back to work?

MR. KAMINSKI: Objection. I don't know how this witness could know what people believed, other people believed, your Honor.

THE COURT: What did they tell you, Mr. Fleshman, if anything? What did they tell you about that, if anything?

A. If I was ever in the conversation from the personnel, salaried personnel standpoint, I would tell them they were wrong because that's the way it was.

. . . . .

Q. Were you aware, as you were working in personnel matters relating to the rim plant, that an awful lot of the salaried people working in salaried positions out there at the rim plant believed that they had a right to go back to work?

MR. KAMINSKI: That's what I object to, your Honor.

THE COURT: Yes. Answer that yes or no.

A. No.

BY MR. SOLOMON:

Q. Do you recall in my deposition when you gave me an answer in which you referred to that as an old wives' tale that even persists nowadays?

A. Um-hum.

Q. So what was the old wives' tale?

A. The old wives' tale was what I thought when I came up through production and I left the union and I went into

---

**2.** See *inter alia* Jay M. Feinman, *Promissory Estoppel, A Judicial Method,* 97 Harv.L.Rev. 678, *Bruchac v. Universal Cab Co.,* 580 F.Supp. 295, 303 (N.D.Ohio 1984).

**3.** The District Court for the Northern District of Ohio has, in fact, applied the *Apponi* test specifically to *promissory* estoppel, *see UAW v. Park–Ohio Industries, Inc., supra.*

production supervision, and at that time I felt that I could go back to the bargaining unit any time I felt like it.

Now after I came into salaried personnel was when someone said, "Wait a minute, Flesh; you don't do it that way."

Q. Okay. But are you aware of any steps that Goodyear management ever took to bring that old wives' tale or that belief or whatever you want to call it to an end?

A. No.

Tr. at 411–413. In addition, Kruse stated that, based upon Goodyear's view of the CBA, the employees had no unilateral right to return to the unit and that such a move could occur only if Goodyear permitted it.

A. This clause has been consistently interpreted to mean that—and the beginning word in the paragraph is "If," and that is "If an employee who is outside of the bargaining unit is permitted to return to the bargaining unit, then based on when they left the bargaining unit is their seniority rights."

And unless you want me to enumerate those, I will not.

The question of interpretation is whether or not the employee is permitted to return is vested with the company, and only after the company grants permission for an employee to return to the unit does the employee fall under this language to determine their seniority.

Q. Okay. Then based upon interpretation of Goodyear of this collective bargaining agreement, a former bargaining unit employee who is in salaried position, what right does that employee as a salaried employee have to return to the bargaining unit?

A. Unilateral right?

Q. What right, any right?

A. They have no unilateral right to return to the unit. They have certain rights if they are permitted to return after they get back under the agreement.

Tr. at 437–438.

In this connection, one further point should be added. Mr. Kruse's comments lend credence to defendant's view that this matter is one of contract interpretation and thus the subject of arbitration. This court does not see that issue in this context. The contract clause offered to this court speaks only to what occurs *if* the employee returns to work. It does not deal with the hows and whys or conditions under which he does so.

The third factor in the *Apponi* test mandates that the employer must intend that the representation be acted upon or that the employer acts in such a way that the employee had a reasonable belief that the promise was intended to mean what it said at the time the statement was made. The aforementioned testimony establishes that Goodyear's promises gave the employees a present right to believe Goodyear intended that the promises be acted upon; *i.e.*, the employees were justified in their belief. Thus, this requirement has been fulfilled by plaintiffs.

The fourth part of the test asks whether the party asserting the estoppel is unaware of the true facts. The fact represented here was that the employees would be free to transfer back into bargaining unit positions at their discretion; the "true fact" was that this broad promise was qualified and that the employees in fact did not have the power to return to the unit whenever they pleased. The testimony of the aforementioned employees establishes that they were unaware of this "true fact." Most of them testified that they would not have taken the supervisory positions without the promise; if they had known the promises were not wholly correct, they would not have made the move. In this regard, the testimony serves to establish not only the employees' unawareness of the "true fact," but also their reliance. *See, e.g.,* Rittenberry, Tr. at 79; Popa, Tr. at 103; Ulrich, Tr. at 113; Minson, Tr. at 146; Black, Tr. at 162; Nathaniel Williams, Tr. at 231; Barney, Tr. at 273; Tudor, Tr. at 286; Lytle, Tr. at 306; Springer, Tr. at 378; Carl Perkins, Tr. at 393. It is also noted from the facts that the employees reliance on the employer's statement was foreseeable by the company representatives.

The fifth element of the *Apponi* test asks whether the claimed reliance was both

justifiable and detrimental. It is at this stage where plaintiffs' claim fails. Although most of the plaintiffs testified that they were damaged by the change in position caused by their reliance as manifested by loss of benefits, layoffs, and claimed emotional injury,[4] the benefits they reaped from the move to the salaried positions far outweighed any loss they eventually suffered from Goodyear's broken promise. Most of the plaintiffs enjoyed a salaried position for a great period of time (as long as 30 years) before Goodyear decided to sell Motor Wheel. Clearly, the change in position stemming from the reliance, on the whole, benefited plaintiffs more than the broken promise harmed them. In this regard, it is simply axiomatic that a change in position which is, on balance, beneficial to the promisee cannot be used to assert estoppel in his favor. Applied to the facts of this case, this principle leads to the conclusion that plaintiffs are precluded from using the principle of estoppel in their favor.

We add yet another view concerning this element. The reliance spoken of here is a reasonable reliance—the reliance of a reasonable man under all the circumstances pertaining to his condition of employment known or which should have been known to him. It is not reasonable for the employee to continue to rely on the verbal statements of the employer for a period of years after the promise was made. It is not the duty of this court to determine with exactness how much time must elapse before reliance is precluded. But is should be said that each plaintiff has served in a management capacity for a length of time sufficient to bar him from unilaterally deciding to return to the bargaining unit simply because he was told he might do so in years past. Conditions in the working place change; so also do the structures of management control. The employee simply may not successfully urge that he is entitled to change the status of his employment from salaried worker to hourly employment without the

agreement of the employer because of some statement of permission to do so received by the employee years ago. This same view in another context is stated at a later point in this opinion.

The court's analysis to this point has been a mechanical one as it should be in arriving at a decision based on matching evidential facts with precedential guidelines. At this point an alternative analysis is offered—one having specific relevance to the labor setting of the instant problem. The opinion of the court in this matter has a potential impact on the interests of a variety of persons and entities. The employee plaintiffs have a deep interest as does the defendant company. Also involved are the interests of the local and international union and, as well, those present employees of the bargaining unit who could be replaced by a plaintiff who is returned to the bargaining unit and has accumulated a sufficiency of seniority with the company to "bump" the present job holder.

The doctrine of estoppel is one long utilized in both English and American courts. The fact that it may be viewed presently as an analytical substitute for certain legal principles of contract law does not change the character of estoppel as an equitable remedy. Promissory estoppel in its active mode may still be viewed as an instrument by which the rights of litigants and, under certain circumstances, the rights of non-litigants as well are protected.

It is the court's view that application of promissory estoppel in a labor setting pursuant to Restatement § 90—such as the instant cause—must properly involve a consideration and balancing of the equities possessed by others who are definitively affected by a decision of a court or arbitrator. Section 90's emphasis on ensuring that injustice is avoided reminds us that estoppel by its very nature and definition is a doctrine which has at its root a concept of justice; a desire to see right done to him

---

**4.** *See* Williams, Tr. at 55; Carroll, Tr. at 71; Rittenberry, Tr. at 83–84; Popa, Tr. at 104; Ulrich, Tr. at 115; Minson, Tr. at 150; Black, Tr. at 165; Morgan, Tr. at 196; Williams, Tr. at 233; Barney, Tr. at 275–76; Tudor, Tr. at 288; Lytle, Tr. at 309; Serdinak, Tr. at 363–64; Springer, Tr. at 381–82; Perkins, Tr. at 394–95.

who is entitled to seek the protection of the law. Surely federal labor common law shares that value. But the right of the claimant must be balanced with the rights of his adversary and, as here, with the rights of others who may or may not be parties to the litigation.

Section 90 of the Restatement dictates that equities existing on the side of the non-parties mentioned should be factored into the eventual estoppel formula. In the developing common law of labor relations, it is best to view the application of equitable doctrines in such a way as to judge the impact of the court's decision on the company, the employee who was the beneficiary of the promise, and as well, the incidental but highly effected parties including the union and its members whose present jobs are in harm's way should the former supervisors be entitled to return to work.

The consideration of third-party interests by a court when framing equitable relief is well-recognized in the law. For instance, in *Byron v. Clay,* 867 F.2d 1049 (7th Cir. 1989), the Seventh Circuit Court of Appeals stated that courts *must* take third parties into account when framing equitable relief. This case involved the doctrine of unclean hands; nonetheless, the court spoke in general terms.

The doctrine of unclean hands, functionally rather than moralistically conceived, gives recognition to the fact that equitable decrees may have effects on third parties—persons who are not parties to a lawsuit, including taxpayers and members of the law-abiding public—and so should not be entered without consideration of those effects. Cf. *Shondel v. McDermott, supra,* 775 F.2d [859] at 868 [(7th Cir.1985)]. It thus is an aspect of the broader principle that adjures a court to consider the third-party effects of equitable relief and to shape that relief accordingly, see, *e.g., Derrickson v. City*

*of Danville,* 845 F.2d 715, 717–19 (7th Cir.1988); *Duran v. Elrod,* 760 F.2d 756, 759 (7th Cir.1985)—if need be, to deny such relief.

*Id.* at 1051. *See also Okaw Drainage District v. National Distillers and Chemical Corporation,* 882 F.2d 1241, 1247–48 (7th Cir.1989) (noting that the effects upon third parties must be considered by a court before an injunction may issue).

The position of plaintiffs is this: when one of the plaintiffs, relying on the promises of company representatives that the employee who chose to enter supervision, might "return to work" *at any time he desired to do so,* he could do so without interference by the company. This court cannot agree with that view. It can reasonably be argued that at some point in time dating from the plaintiffs acceptance of a management position he must be considered as having lost his right to return to the bargaining unit. This is not to say that labor and management may not agree to some system of allowing him to do so—it simply says that absent an agreement or specific common practice (which is not found here to be extensive in nature), equity does dictate that the plaintiffs cannot return to work after the passage of periods of time such as are involved in this cause.

In sum, then, this court finds that plaintiffs have not only failed to meet the *Apponi* standard, but have also fallen short of the test commonly applied to promissory estoppel as established in Restatement § 90. This section provides that promissory estoppel applies *only* where enforcement of the promise is necessary to avoid injustice. The court has analyzed the claims of plaintiffs as required by the mandate of the Circuit Court. Having done so, the court determines the issues referred for decision in favor of defendants Goodyear and against the parties plaintiff.[5]

---

5. The court has also considered the question of the determination of seniority should the plaintiffs be found eligible and return to the bargaining unit. Though not applicable because of the finding enunciated, the question of seniority standing is one reserved for arbitration. It is not susceptible of resolution by this court's opinion inasmuch as interpretation of the CBA would be required to reach an answer to the question raised. See *Lingle v. Norge Division Magic Chef,* 486 U.S. 399, 411, 108 S.Ct. 1877, 1884, 100 L.Ed.2d 410, 422 (1988).

### III. CONCLUSION

For the foregoing reasons, this court finds in favor of defendants on plaintiffs' state law claims. Plaintiffs, thus, are entitled to no relief. This cause, then, is dismissed as to all plaintiffs.

IT IS SO ORDERED.